**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:20-cv-20079-SINGHAL/LOUIS

BRUCE MUNRO, *et al.*,

      Plaintiffs,

v.

FAIRCHILD TROPICAL BOTANIC
GARDEN, INC., *et al.*,

      Defendants.

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SANCTIONS FOR SPOLIATION (DE [153])**

More than 100 days after the close of discovery and 500 days since the filing of this lawsuit, Plaintiffs for the first time seek Court intervention regarding conduct that occurred *in January 2020* when Kilburn Live/NightGarden LLC concluded the season 2 *NightGarden* event at Fairchild Tropical Botanic Garden ("Fairchild") and disassembled and stored its attractions as a matter of course and contractual obligation. Though Plaintiff Munro filed this lawsuit prior to the conclusion the *NightGarden*, he took no steps in this litigation to require Fairchild or the Kilburn Defendants[1] to maintain its two-dozen acres of public, outdoor winter light installations in statis for purposes of this litigation. He did not request that Defendants[2] permit him to inspect the event or to maintain the expansive display as is. He also did not enlist the Court's assistance in obtaining either an inspection or injunction against disassembly and storage. In fact, Plaintiff Munro sent his U.S. publisher, Gregory Sharp, to inspect the *NightGarden* prior to filing this lawsuit. On Plaintiff's behalf, the inspector took pictures and videos of the event while it was open to the public, presumably for the purpose of preparing the complaint.[3] (DE [1], [69], figs. 27-29, 31-35) (depicting photographs from Plaintiff's presuit inspection of the *NightGarden*).

Defendants did nothing surreptitious in disassembling and storing the *NightGarden*. The concluding date was no secret, and anyone visiting Fairchild after the event concluded could have gleaned the displays were put away. But in May 2020, Defendants explicitly informed

---

[1] The "Kilburn Defendants" for purposes of this motion are Kilburn Live, Kilburn Media, and NightGarden, LLC. Max Painter and his Imaginer companies did not receive any pre-suit notice from either Plaintiff and were not joined into this lawsuit until long after the *NightGarden* event concluded and was stored. Accordingly, it is unclear why Plaintiffs seek relief at all against these Defendants, though Plaintiffs' general pattern is to fail to differentiate the conduct among the various Defendants.

[2] The term "Defendants" excludes Defendant Zhongshan G-Lights Lighting Co., Ltd.

[3] The initial complaint (filed prior to the closing of the second season of the *NightGarden*) includes photographs taken from inside the event. Nothing prevented Plaintiffs' inspector/ photographer from taking photographs or videos of the event.

Plaintiff Munro[4] that the lights at issue in this litigation were in storage in a California warehouse. (*See, e.g.*, DE [157-6] at 5, Request No. 10) (explaining in May 2020 that *NightGarden* installations were available for inspection in a warehouse in Commerce, California); (DE [157-5] at 4-5, Interrogatory No. 7) (indicating in November 2020 that *NightGarden* was removed in January 2020). Because of the pandemic, exemplar lights were ultimately shipped to defense counsel's offices in Florida, where Plaintiff's counsel was permitted four hours to inspect and photograph/videotape them.[5]

This case is about whether the *NightGarden* used individual lights that are substantially similar to Plaintiffs' lights and whether Defendants violated the DMCA in failing to attribute their lights to Plaintiffs.[6] In their motion, Plaintiffs complain that they are "unable to view and inspect the infringing work," and do not have the "ability to walk through the installation" (*see* DE [153]) at 5, 7.) They claim the routine disassembly of the *NightGarden* constituted spoliation and ask the Court to sanction all Defendants in the form of dismissal of certain defenses and judgment pertaining to the *NightGarden* season two.[7]

## ARGUMENT

What Plaintiffs really seek – without conferral – is to untimely litigate discovery disputes they failed to raise at an appropriate time.[8]  They also inappropriately claim spoliation of items

---

[4] The studio Plaintiff was not added to this action until the amended complaint was filed in July 2020.

[5] Plaintiffs' counsel concluded its inspection in under an hour. Likewise, Plaintiffs' lights were shipped to counsel's office for inspection in Florida.

[6] This case is not about any particular arrangement of the lights, as Munro testified, he is not claiming any defendant copied the arrangement of any Munro installation of these same lights. (Statement of Material Facts "SOF" (DE [146]) ¶ 30; Deposition of Bruce Munro (DE [149-1]) at 23:8-24:7)("Munro Dep.").

[7] The Motion cannot pertain to season 1 of the *NightGarden* because it was disassembled and stored for season 2 long before Plaintiffs sent their demand letter or filed suit.

that were not spoliated and that Defendants had no obligation to preserve as they were on display at Fairchild. But even if Defendants should have kept season 2 *NightGarden* on display in its full 20-acre plus glory during the pendency of this lawsuit, there exists no justification for sanctions, much less the severe sanctions sought by Plaintiffs, against any Defendant because Plaintiffs cannot show prejudice, importance, bad faith or potential abuse.

## I.   Plaintiffs Failed to Confer about the Motion

Plaintiffs violated Rule 7.1, S.D. Fla. Local Rules by failing to confer prior to filing this motion. They did not even attempt to do so, so it is unsurprising the Motion does not include the certification required by Local Rule 7.1(a)(3). "Failure to comply with the requirements of this Local Rule may be cause for the Court to grant or deny the motion and impose on counsel an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee." S.D. Fla. L.R. 7.1(a)(3). Defendants request an order requiring Plaintiffs to pay the amount of the fees they have incurred in responding to the Motion.

## II.   Plaintiffs' Motion is Untimely.

Were Plaintiffs serious about this Motion, they would have sought relief in January 2020—before the event ended—or during discovery a year ago when Defendants informed Plaintiffs the *NightGarden* installations were in storage in California. Instead, having received

---

[8] Plaintiffs have been warned before about their dilatory tactics and their untimeliness. *See* (DE [106]) ("Plaintiffs' dilatory tactics will not be condoned in this case"); (DE [124] at 4) ("All of the disputes raised by Plaintiffs are issues that could have—and should have—been identified and addressed long before the close of discovery"); (DE [160] at 3) (denying motion to compel as "untimely");(DE [169]) ("why did Plaintiffs wait 16 days to file this 33 page motion but expect a response and a ruling within five days? The question is rhetorical and requires no answer. The Court will not tolerate such tactics").

Defendants' May 2020 discovery responses explicitly indicating that the *NightGarden* components were shipped to California for secure storage, Plaintiffs did nothing.

In August 2020, the parties referenced in their Joint Motion to Amend Scheduling Order that Plaintiffs intended to request delivery of *NightGarden* "tangible works" or "tangible items" from California to Florida and was silent as to the event as a whole, raising no concern with the Court that the *NightGarden* was no longer on display at Fairchild. (DE [74] at 3 ¶ 6.) In September/October 2020, *Defendants* requested to inspect Plaintiffs' lights and, when Plaintiffs insisted that Defendants travel to the UK to see them, Defendants timely sought court relief via discovery hearings to inspect Plaintiffs' physical lights here in Florida. (*See* Orders at DE [82, 87].) Despite frequent discussion of the inspection of both sides' lights, at no time before the Motion did Plaintiffs lodge any formal complaint about the fact that Defendants had disassembled and stored the lights at issue or make any request of this Court in that regard.

Thereafter, in November 2020 Plaintiffs inexplicably served a request for inspection of the *NightGarden*, in response to which Defendants *again* explained that such an inspection was impossible, as the event had concluded 11 months prior. *See, e.g.*, Kilburn Live, NightGarden and Fairchild's Responses to Plaintiffs' Request for Entry and Inspection dated November 5, 2020, attached as Composite <u>Exhibit 1</u>. And again, Plaintiffs did nothing with these responses.

In December, after Plaintiffs requested that one of each of the physical components be shipped to Florida, Defendants listed the light components available for inspection, and shipped the light components from California to Florida. *See* email regarding components made available for inspection at <u>Exhibit 2</u>. Plaintiff's Florida counsel then inspected them on February 17, 2021 without incident. *See* Plaintiffs' Notice of Inspection, attached as <u>Exhibit 3.</u>

Like the remainder of Plaintiffs' recent filings, this Motion is a cloaked discovery motion that "could have—and should have—been identified and addressed long before the close of discovery." (DE [124] at 4.) It is untimely. Courts in this district and others routinely deny such motions where the moving party sits idly by for months (or in this case, more than a year). *See Haney v. PGA Tour, Inc.*, No. 19-CV-63108, 2021 WL 535366, at *2 (S.D. Fla. Feb. 13, 2021) (denying an untimely discovery motion where the parties waited several months before bringing the dispute before the court); *Kendall Lakes Towers Condominium Assoc. Inc. v. Pacific Ins. Co, Ltd.,* 2011 WL 6190160 (S.D. Fla. Dec 2, 2011)(seeking discovery sanction without seeking preliminary relief runs afoul of SDFL Local Rule 26.1); *See Scalia v. Cty. of Kern*, No. 117CV1097NONEJLT, 2020 WL 5959905, at *6-7 (E.D. Cal. Oct. 8, 2020) (denying motion because of nine-month delay and collecting cases denying motions for spoliation after close of discovery); *Ferrone v. Onorato*, No. CIV.A. 05-303, 2007 WL 2973684, at *10 (W.D. Pa. Oct. 9, 2007), *aff'd*, 298 F. App'x 190 (3d Cir. 2008) (denying an untimely spoliation motion that should have been redressed "through an appropriate discovery motion"); *Cottle-Banks v. Cox Commc'ns, Inc.*, No. 10CV2133-GPC WVG, 2013 WL 2244333, at *16 (S.D. Cal. May 21, 2013) (spoliation motions "should be filed as soon as reasonably possible after discovery of the facts that underlie the motion") (rejecting spoliation motion filed almost nine months after plaintiff knew facts and outside 30-day discovery deadline); *Mahboob v. Educ. Credit Mgmt. Corp.*, No. 15-CV-0628-TWR-AGS, 2021 WL 791853, at *2 (S.D. Cal. Mar. 1, 2021) (denying a spoliation motion, in part, as untimely due to 30-day discovery deadline). This case has been no different (*See* DE [106, 107, 124, 160]).

At the latest, Plaintiffs knew that the installations were in storage in California in May 2020, yet they sat idly by for almost a year, while finding time to serve other repeated and

lengthy discovery requests and even inspecting the lights at issue at counsel's office without seeking relief from the Court for purported spoliation. Plaintiffs' delay is unjustified, and the motion should be denied on this ground alone. *See* (DE [124] at 4) (citing *United States v. Marder*, No. 1:13-CV-24503-KMM, 2016 WL 2897407, at *4 (S.D. Fla. May 18, 2016) (noting that a party "cannot just stand idly by and wait" to resolve a discovery dispute); *see also* (DE [160]) (enforcing Local Rule 26.1(g)(1) to deny Plaintiffs' untimely discovery motion).

### III.   Spoliation Sanctions are not Warranted in this Case.

Notwithstanding the lack of conferral and untimeliness of the Motion, Plaintiffs cannot prevail on the merits of their Motion. No spoliation has occurred.

Spoliation is defined as "the intentional destruction, mutilation, alteration, or concealment of evidence." *Jetport, Inc. v. Landmark Aviation Miami, LLC*, No. 1:16-CV-23303-UU, 2017 WL 7732869, at *2 (S.D. Fla. July 24, 2017); *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020), cert. denied, No. 20-1104, 2021 WL 1520816 (U.S. Apr. 19, 2021). The party seeking spoliation sanctions must prove that (1) missing evidence existed at one time, (2) the alleged spoliator had a duty to preserve evidence, and (3) the evidence was crucial to the movant being able to prove its prima facie case. *Jetport, Inc.* 2017 WL 7732869, at *2. Even if all three elements are met, "[a] party's failure to preserve evidence rises to the level of sanctionable spoliation 'only where the absence of that evidence is predicated on bad faith,' such as where a party purposely loses or destroys relevant evidence." *Id.*

If the movant can meet this burden, then Courts consider the following relevant factors when determining whether to impose sanctions for spoliation: "(1) whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party

acted in bad faith, and (4) the potential for abuse if sanctions are not imposed." *Tesoriero*, 965 F.3d at 1184 (quoting *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018)). Spoliation sanctions cannot be imposed for negligently losing or destroying evidence – only upon a finding of bad faith. *Id.* In the context of spoliation, "bad faith" generally means "destruction for the purpose of hiding adverse evidence." *Id.* (quoting *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015)); *Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010)(denying motion for spoliation). Even when sanctions are warranted, dismissal is rare. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) ("Dismissal represents the most severe sanction available to a federal court" which "should only be exercised when there is a showing of bad faith and where lesser sanctions will not suffice"); *see also Kaloe Shipping Co. v. Goltens Servs. Co.*, Inc., No. 06-22186-CIV, 2007 WL 9705867, at *2 (S.D. Fla. June 21, 2007), report and recommendation adopted, No. 06-22186-CIV, 2007 WL 9706012 (S.D. Fla. July 10, 2007) (finding dismissal inappropriate without a showing of bad faith and that lesser sanctions would not suffice). Plaintiffs cannot meet their burden, and their Motion should be denied.

### A.    Spoliation did not Occur

First, no evidence is missing. As Plaintiffs have admitted in their Motion, the lights at issue are not "missing" because they were preserved and put in storage. Motion at 5. In fact, there is significant evidence related to the *NightGarden.* As mentioned, Plaintiffs sent their U.S. publisher Mr. Sharp to personally visit the *NightGarden* season two, in November 2019. Mr. Sharp was there for several hours, walked the entire Fairchild facility, and took photographs and videos of the event at Plaintiffs' request. *See* Deposition of Gregory Sharp 68:15-70:24 (DE [174]) excerpts attached as  Exhibit 4; *See* Deposition of Jennifer Lewis 160:2-4 (DE [149-2] at 8)

excerpts attached as <u>Exhibit 5</u>; *see also* Munro Dep. 294:12-295:8, (DE [136](under seal) excerpts attached as <u>Exhibit 6</u>. The *NightGarden* was a public event, and Plaintiffs could have sent multiple representatives (or its Florida counsel) to attend the *NightGarden* as many times as they wished. In addition, Defendants produced a trove of photographs and videos of the event during discovery.[9]

Second, Defendants did not have a duty to leave the entire 20+ acre *NightGarden* intact for some indeterminate amount of time. At the outset, the Imaginer Defendants had no duty to preserve at all. *E.g. Easterwood v. Carnival Corp.*, 2020 WL 6781742 *5 – 6 (S.D. Fla. Nov. 18, 2020) (duty to preserve does not arise until litigation is pending or reasonably foreseeable and applies only to evidence within that party's possession, custody or control). Max Painter and the two Imaginer companies were not copied on the demand letter (which did not request preservation in any event). (DE [148-18].) They were not added as parties to the lawsuit until July 2020, six months after the lawsuit was filed and the *NightGarden* was disassembled and stored. (DE [69].) Moreover, these lights do not belong to the Imaginer Defendants, and they did not participate in the disassembly or storage of the *NightGarden* components. *See* Imaginer and Painter Responses to Requests for Admission dated November 2, 2020, attached as <u>Composite Exhibit 7</u>. Accordingly, these defendants had no duty to preserve at all.

As to the remaining defendants, Plaintiffs seek to extend their preservations obligations

---

[9] Plaintiffs baselessly claim that "Defendants have refused to disclose the bulk of photographs in their possession" and "claim[ed] th[at] the photographs [of *NightGarden*] are irrelevant." (DE [153] at 7-8.) Defendants produced many *NightGarden* videos and photographs at KILBURN582-589, 689-772 and 830-853, i.e., those in their custody, possession or control. They were not required to scour the internet for random strangers' photographs and footage of the *NightGarden*, and nothing prevented Plaintiffs from taking the time to do that had they wished. In any event, any perceived issues with Defendants' production are untimely and are not appropriately before the Court.

too far. Fairchild is a public, non-profit botanical garden open to the public. Plaintiffs' request that the *NightGarden* be preserved indefinitely would be tantamount to complete disruption of normal business for Fairchild for an indeterminate amount of time while weather and other environmental conditions slowly erode and render worthless Kilburn Live's light fixtures. Courts do not impose such disruptive duties with regard to preservation. *See Chaparral Energy, L.L.C. v. JNB Trucking, L.L.C.*, No. CIV-12-94-R, 2012 WL 12859856, at *2 (W.D. Okla. Dec. 17, 2012) (duty to preserve did not extend to keeping an expensive piece of equipment unrepaired and out of service indefinitely); *see also McDonald v. ISK Biosciences, Inc.*, No. CIV.A. H-95-4730, 1997 WL 34479221, at *2 (S.D. Tex. Jan. 21, 1997) (no duty to "interrupt the operation of [defendant's] plant, including the completion of its scheduled construction project" to preserve the layout of a room where an alleged assault occurred). *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1312 (N.D. Ga. 2011) (the "touchstone in evaluating a party's preservation efforts is the party's good faith and reasonableness").

Safeguarding items for later inspection by moving the evidence to storage is sufficient preservation. *See Khaldei v. Kaspiev*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013) (moving boxes of photographs and negatives from an apartment to a storage locker does not amount to spoliation). This is true even if the items are disassembled but capable of reassembly. *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 444 (S.D.N.Y. 2010) (denying a motion for sanctions even though data was removed from a hard drive because the data was ultimately recovered and provided to counsel); *see also Russ v. Berchtold Corp.*, No. 12-CV-24482-UU, 2013 WL 12092524, at *1 (S.D. Fla. Dec. 23, 2013) (denying a motion for sanctions where a surgical lamp was reinstalled in product liability context because plaintiff failed to explain how reinstalling the lamp would destroy evidence crucial to any claims).

Here, the Kilburn Defendants acted reasonably when they dismantled, preserved, and safely stored the lights for later inspection. Plaintiffs inspected the reassembled lights, exactly in the working condition they appeared at the *NightGarden*. Defendants adequately discharged their duty to preserve.

Finally, regarding the third prong, to warrant a spoliation sanction, a party must "show a significant impairment in the ability to prove their underlying case" and if evidence other than that which is alleged to have been destroyed exists, the spoliated evidence is not deemed to be crucial. *Jetport*, at *5. As listed above, significant evidence exists of the *NightGarden* displays. Plaintiffs took their own photos and videos. Defendants produced photos and videos. The internet also housed its own treasure trove of images of the *NightGarden* that Plaintiffs could have (and did) locate.

Moreover, as explained in detail below (pp. 13-15, *infra*) Plaintiffs have not, and cannot, articulate any relationship between viewing the *NightGarden* again and proving their claims. Plaintiffs have admitted the arrangement of the lights is not relevant.  In fact, Plaintiffs demand letter actually asked Kilburn and Fairchild *to disassemble* the exhibition and turn the lights over to Plaintiffs. (DE [148-18].) Their pre-suit request is at odds with their Motion filed 18 months later claiming that they must be able to walk the gardens to prove their claims. (Motion at 5.)[10]

Similarly, the *NightGarden* event has no bearing on the DMCA claim. Plaintiffs' entire DMCA claim concerning the event signs is that they should have mentioned Munro. (DE [69] ¶

---

[10] If selection and arrangement were at issue, Plaintiffs actually ask the Court to bless a double standard – one where Defendants would be obliged to preserve their exhibition as is and Plaintiffs would not. Indeed, many of the various displays of Munro's lights were set at different gardens and venues that have long since been removed. Defendants have no ability to inspect Munro's lights at Longwood Gardens, for instance, an exhibition that occurred in 2012 and is Plaintiffs' purported registered work that is at issue in this lawsuit. (DE [153] at 4.)

149.) As detailed at length in Defendants' Joint Motion for Summary Judgment (DE [145]), Plaintiffs' DMCA claims are unfounded. Importantly, Plaintiffs *do not own and did not create* the works complained about. (*See id.* at 11); *see also* Munro Dep. 64:9-18 (DE [149-1] at 16.) The signs are no different. The *NightGarden* signs were directional in nature, prompting guests to enter, exit, or queue; and Kilburn Live's corporate designee corroborated that fact. *See NightGarden* signs and related correspondence, attached as <u>Composite Exhibit 8</u>. *See* Deposition of Jonathan Sanford ("Sanford Dep.") 171:12-172:11, (DE [139](under seal)), excerpts attached as <u>Exhibit 9</u>; *see also* Deposition of Max Painter 198:15-199:12 (DE [141](under seal) (recalling that light installations were not labeled or referenced on signage)), excerpts attached as <u>Exhibit 10</u>. In addition to producing depictions of the signs, videos produced by Defendants show footage of the entire event and capture some of what limited signage there was. Their ability to hold or look at the basic signs in person has no bearing on that claim. This is not a question of whether the signs were physically defective or what material they were made from—the only pertinent questions are whether Munro's name was on them (no) and whether that forms the basis for a real legal claim (also no). To conclude that Defendants had a duty to keep all the lights and "exit" and other similar signs up at Fairchild is unfounded.

In sum, Plaintiffs have not demonstrated that relevant evidence is "missing," that Defendants had a duty to preserve the *NightGarden* event in perpetuity, that the evidence is crucial to their claims or that spoliation otherwise occurred. No spoliation has occurred here.

**B.  To the Extent Defendants Were Required to Preserve the Temporary *NightGarden* Event, Plaintiffs Cannot Otherwise Meet their Burden.**

Even if the Court finds that Plaintiffs' request is timely and Defendants were required to do something more than safely store the light fixtures and make them available for inspection, Plaintiffs cannot meet their burden to demonstrate any sanctions are warranted.

### 1.   Plaintiffs Cannot Show Prejudice or Importance of the Evidence.

Plaintiffs claim that their inability to view and count the lights and signs is prejudicial to their claims and affects their ability refute Defendants' defenses and calculate their statutory damages. (DE [153] at 5, 8.) These arguments fail because (1) Plaintiffs inspected the *NightGarden* and lights; (2) Defendants produced invoices showing the number of lights purchased, maps, videos, correspondence and photographs of the event, (3) Defendants used the same "mushroom" lights in both seasons, as Plaintiffs very well know, and (4) the signs are not important to any cognizable claim.

➢ ***The Lights and Their Use are Quantifiable.***

Plaintiffs claim they cannot "determine the total number of infringements, or the supposed continuity of infringement from season to season." (DE [153] at 5-6.) They claim that Defendants installed "new displays" and without seeing season two (again) in person, they are prejudiced. (DE [153] at 6.) This type of sweeping and conclusory argument is unsupported by both the law and record in this case.

Starting with the issue of different or new displays, Plaintiffs seek statutory damages for an alleged work titled *Forest of Light*, which was registered with the U.S. Copyright Office after season one but before season two of *NightGarden*. (SOF DE [146] ¶¶ 8, 84.) As fully briefed in Defendants' Motion for Partial Judgment on the Pleadings and their Joint Motion for Summary Judgment, Plaintiffs are not entitled to any statutory damages for season one under any theory and are also not entitled to statutory damages for season two because the alleged infringement is the same or similar as that of season one. 17 U.S.C. § 412; (DE [81, 89]); (DE [145] at 31-32.) As noted in those papers and in their Motion, Plaintiffs contend that the allegedly infringing lights from season one were altered or changed in season two. But even if that were true, it

would not affect Defendants' defenses—changes or alterations would still bar Plaintiffs' statutory damages and fees claims. *See, e.g.*, *New Name, Inc. v. The Walt Disney Co.*, No. CV 07-5034PA(RZX), 2008 WL5587487, at *5 (C.D. Cal. July 23, 2008) (alteration to work does not commence new infringement); *Dyer v. Napier*, No. CIV04-0408 PHX SMM, 2006 WL 680551, at *4 (D. Ariz. Mar. 16, 2006) (changes in sizes and texture of sculptures does not start new commencement). More importantly, however, there were no alterations. Defendants provided evidence that the alleged infringing mushroom lights from season two were simply leftovers recycled and reused from season one. *See* SOF (DE [146]) ¶¶ 97-100.) Further, season one closed January 2019. Even though Plaintiffs, through a representative, did walk through *NightGarden* season two, the ability to do so again would not change the ultimate outcome or give them any insight on how lights were displayed or used in season one.

Next, Plaintiffs' arguments that they cannot quantify the number lights used is also without basis and unsupported by copyright law. Even if Plaintiffs were entitled to statutory damages (they are not), under the Copyright Act, Plaintiffs would only be entitled to statutory damages "per work" not by the number of the individual lights displayed. *See Joe Hand Promotions, Inc. v. Phillips*, No. 19-21723-CIV, 2020 WL 3404964, at *3 (S.D. Fla. June 19, 2020); *see also* 17 U.S.C. § 504(c). As for actual damages, Plaintiffs make no claim in their Complaint that the number of lights is relevant, nor have they ever licensed any of their individual lights. *See* SOF (DE [146]) ¶ 107 (citing testimony that Plaintiffs have never licensed their lightbulbs).[11] Further, as explained in detail below, the number of lights used has no bearing

---

[11] Plaintiffs' proposed expert similarly conducted *no* analysis of any individual lights, nor did she tie her calculation to lights at the *NightGarden* at all. She instead calculated a straight average of a handful of Munro's previous exhibition agreements without regard to what lights were displayed by Munro, the number of lights displayed, geographic size or other considerations. *See*

*[Footnote continued on next page…]*

on Plaintiffs' DMCA claim, because Defendants' works are not Plaintiffs' works. In any event, Defendants testified as to the number of at-issue lights used and provided invoices supporting those numbers. (DE [146] ¶¶ 98, 100, 102, 104-05.) Plaintiffs fixate on Jonathan Sanford's testimony stating that he was not sure how many fiber lights were deployed in season two of *NightGarden*. (DE [153] at 6.) But Defendants had provided an invoice showing that 600 fiber lights were purchased for season two. (DE [146] ¶ 105.) In the absence of certainty, Plaintiffs would be expected to argue (although irrelevant for damage purposes) that Defendants should be liable for the full number of lights purchased.

In chastising Defendants for taking down *NightGarden*, Plaintiffs rely on *Oil Equip. Co. Inc. v. Mod. Welding Co. Inc.*, 661 F. App'x 646 (11th Cir. 2016) to support their proposition that photographs are not enough—despite having invoices, *NightGarden* maps, photographs, videos, extensive correspondence about the attractions and an opportunity to inspect the lights (DE [153] at 7.) But *Oil Equipment* did not create a per se rule that photographs could never be sufficient evidence. The court merely opined on the specific circumstances of that case "[w]ithout expressing any opinion on whether photographs could constitute an adequate substitute in another case based on different facts." *Oil Equip.*, 661 F. App'x at 656. That case involved an underground storage tank that began to leak. The court found prejudice because the tank was removed from the ground and pictures of the soil could not help someone determine "the soil compaction level of the bedding." *Id.*; *see also Flury*, 427 F.3d at 946 (prejudice could not be cured because vehicle was destroyed and could not be examined). Again, the removal and storage of the lights does not prejudice Plaintiffs—Plaintiffs inspected them both while they

---

Defendants' Motion in Limine to Exclude Plaintiffs' Damage Expert Xiliary Twil (DE [135]; Deposition of X. Twil (DE [135-2] at 62:9-63:12; 70:3-6, 71:24-72:8).

were on display and in this litigation. The physical layout of the lights at *NightGarden* is not crucial to any claim because Plaintiffs are not enforcing any copyright over the arrangement of lights. (DE [149-1] at 23:8:19.) And Plaintiffs have testimony and evidence as to the locations, estimated square footage and number of lights used in both seasons. The same goes with event signage—their physical componentry is not at issue. Images of the signs are sufficient to demonstrate how they looked. *See* Ex. 8. As for Plaintiffs' claims that they need to know the location or use of signage at *NightGarden*, that claim is without legal basis as set forth below.

> ➢ ***Keeping the Signage in Place at Fairchild is Not Important to Any Cognizable Claim.***

In essence, Plaintiffs claim that Defendants—despite not knowing or recalling who Munro was (*see* DE [145] at 22)—should have attributed him on all signage at *NightGarden* because some generic lights from China allegedly resemble Munro's works. (DE [69] ¶¶ 149, 176.) Plaintiffs do not claim that the signs resemble any Munro work. Instead, they claim that not including Munro's name is a violation of the DMCA for each sign displayed at *NightGarden*.[12] As explained in detail in Defendants' Joint Motion for Summary Judgment (DE [145] 7-13), this claim is not recognized in the law. Specifically, CMI "removal" under the DMCA requires an affirmative act of removal from an original work, not a failure to attribute in relation to what Plaintiffs call "knock-offs." (*See id.* at 8) (citing *Frost-Tsuji Architects v. Highway Inn, Inc*., 2014 WL 5798282 (D. Haw. Nov. 7, 2014); *see also RAZ Imports, Inc. v. Regency Int'l Business Corp.*, 2020 WL 4500627 (N.D. Tex. Aug. 5, 2020) (dismissing a DMCA claim with prejudice

---

[12] Plaintiffs also parrot the language of 17 U.S.C. § 1202 by saying they have to guess how many times CMI was "removed, falsified, altered or distributed." Plaintiffs do not identify any CMI, or what CMI of theirs was removed, falsified, altered or distributed. Munro did not create the signs, there is no claim that the signs resemble any Munro work, and certainly Munro does not have (nor claim to have) any right to words like "exit" or "welcome." And although the *NightGarden* contained <u>no</u> Munro works, there is also no CMI on Munro's components that he installs in his actual displays. (DE [146] ¶¶41-42, 50-51.)

because merely failing to give attribution is not the same as "removing" CMI). Plaintiffs fatally concede that *NightGarden* is not their original work, and they had no part in creating or implementing the event. *See, e.g.*, SOF (DE [146]) ¶¶ 88-89 (citing testimony from Munro that Plaintiffs had no role in the *NightGarden* event). Therefore, there is no cognizable claim here. If Plaintiffs believe that "viewing the signage as it was placed" at Fairchild is "of the utmost importance in this case" (DE [153] at 6), then they should have counted the directional signs while visiting the *NightGarden* during season two. There is no prejudice or practical importance because whether Plaintiffs could – or did  – count the number or signs, the result is the same – they are irrelevant because there is no viable claim under the DMCA. *Tesoriero*, 965 F.3d at 1183–84 (evidence must be crucial to movant's ability to prove its case to establish spoliation).

Further, the documents produced, and testimony provided unequivocally demonstrates that the signage did not mention the specific installations, but was "directional" in nature, such as informing guests how to enter or exit the event. *See* Ex. 8. Even if the law permitted Plaintiffs' theory, it certainly would not extend to attributing Munro on an "exit" sign.

### 2.   Defendants Did Not Act in Bad Faith.

Further, Plaintiffs have not met their high burden of showing that the removal of the temporary winter *NightGarden* event from Fairchild constitutes bad faith. Where, as here, there exists no direct evidence of bad faith, Plaintiffs must prove all of the following criteria: (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly

explained as not involving bad faith by the reason proffered by the spoliator. *Jetport*, 2017 WL 7732869, at *3, *7 (no spoliation where only negligence shown).

Plaintiffs cannot meet any of the criteria. Plaintiffs have not argued any direct evidence of bad faith (nor is there any). Instead, Plaintiffs generally claim that lights were shipped out of state after some alleged notice, and there was no credible explanation for same. These sweeping allegations do not come close to meeting the high standard required of Plaintiffs. Nor can Plaintiffs meet such a standard in this case.

First, as explained in detail above, counting the number and placement of lights and signage is immaterial to Plaintiffs' claim. Plaintiffs have admitted that the case is not about the arrangement of the lights and they have inspected the event and actual lights at issue. Their contention that they need to (again) count the signage and lights in situ at Fairchild is not supported by the facts or the law.

Second, Defendants never caused evidence to be lost. As Plaintiffs recognize in their Motion (DE [153] at 8), the lights were merely transported off-site, and then later sent back to Florida for Plaintiffs' inspection. As for Plaintiffs' position that the layout of *NightGarden* was lost, as stated above, that contention is immaterial, and either way Plaintiffs sent a representative to Fairchild to observe and catalog the event, and Defendants produced a trove of pictures and videos of the event.

Third, Defendants were never "fully aware" of Plaintiffs' desire to walk through the temporary *NightGarden* event, which all parties knew was pre-scheduled to end on a date certain. *Tesoriero*, 965 F.3d at 1185 (quoting *Flury*, 427 F.3d at 945). In *Flury*, the plaintiff was "fully aware the defendant wished to examine the vehicle" at issue but ignored a request to examine it. *Flury*, 427 F.3d at 945. On the other hand, in *Tesoriero*—which involved a broken

chair on a Carnival cruise ship—the chair was disposed of consistent with Carnival's policies for broken items and the record showed that the plaintiff had not requested that Carnival save the chair from destruction. *Tesoriero*, 965 F.3d at 1185. This case is analogous to *Tesoriero*. Here, Defendants could not have anticipated that a walk-through was necessary in a claim involving the shape and design of generic light bulbs. And Plaintiffs never requested that Defendants preserve the event. Instead, they buoy their previous arguments that Defendants were on notice of Plaintiffs' claims because some of them received the presuit letter "outlining the allegations of infringement and CMI violations" as well as service of the initial Complaint. (DE [153] at 9.)

But the presuit letter did not address the fiber lights, Plaintiffs' unsupported view of the DMCA nor ever referenced CMI.[13] Instead it asked Defendants to "remove the offending portions from the NightGarden exhibition" and to send the lights to Munro. (DE [148-18]) (emphasis added). Plaintiffs explicitly requested destruction – not preservation – of the light displays. Had Defendants complied with Plaintiffs' pre-suit demand, compliance would itself have caused the very same "spoliation" Plaintiffs now complain about. Only later in the case did Plaintiffs reveal their objection to the disassembly of the event and desire to walk through it, well after they were made aware it was taken down and the at-issue components shipped to storage. It can hardly be considered bad faith for the Kilburn Defendants to do exactly what Plaintiffs requested that they do (remove the lights from the *NightGarden*).

Last, Plaintiffs have proffered no evidence that Defendants removed *NightGarden* from Fairchild "for the purpose of hiding adverse evidence" favorable to Defendants. *Tesoriero*, 965 F.3d at 1184; *see also Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2009 WL

---

[13] And the initial complaint related to the individual light designs and spoke of CMI claims generally. (*See* DE [1].)

3823390, at *16 (S.D. Fla. Nov. 16, 2009) (concluding that bad faith can be established by circumstantial evidence only when the "act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator"). Instead, there is a reasonable explanation for removing *NightGarden*—the event had a scheduled ending date and maintaining a pop-up light show at a nonprofit botanical garden indefinitely would ruin its business. *See Chaparral Energy*, 2012 WL 12859856, at *2 (duty to preserve did not extend to keeping an expensive piece of equipment unrepaired and out of service indefinitely); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d at 1312 (the "touchstone in evaluating a party's preservation efforts is the party's good faith and reasonableness"). Further, the closure and removal of *NightGarden* attractions was pre-scheduled and occurred as a matter of course, just like season one. *See* Ex. 9, Sanford Dep. 243:16-245:1 (explaining that removal of the event was scheduled far in advance and normal protocol). Plaintiffs have not shown how Defendants' pre-arranged closure of *NightGarden* amounts to bad-faith conduct, especially where the light bulbs at issue were preserved. For these reasons, Plaintiffs have not met their high burden.

### 3.   There is No Potential for Abuse.

Plaintiffs summarily claim that there is a potential for abuse absent sanctions because only Defendants can present evidence regarding the similarities between seasons one and two, the number of lights displayed, and the number of CMI violations. (DE [153] at 9); *see Flury*, 427 F.3d at 946; *see also Nat'l Grange Mut. Ins. Co. v. Hearth & Home, Inc.*, No. CIV.A. 2:06CV54WCO, 2006 WL 5157694, at *6 (N.D. Ga. Dec. 19, 2006) (the judicial concern for potential for abuse is "trial by ambush").

The *NightGarden* season one was deconstructed in January 2019 (well before Plaintiffs sent a demand), and despite the fact that there was no requirement to preserve materials from that

season, Defendants did so. Indeed, Defendants provided the actual mushroom lights (as re-used in season two), testimony, photographs, videos, invoices and correspondence from season one. Simply put, in-person comparisons related to season one could never occur, regardless of the installation status of season two, because Plaintiffs did not complain until long after season one was over. As to Plaintiffs' claims regarding counting each light, Plaintiffs could have done so during its own inspection. Regardless, Defendants provided evidence and discovery regarding approximate acreage and number of lights used in each season (mushrooms) and how many lights were ordered (mushrooms and fiber lights). Last, as noted above, Plaintiffs' CMI theory is entirely unfounded. The number of directional *NightGarden* signs is irrelevant and cannot affect Plaintiffs' claim.

## **CONCLUSION**

The Court should deny Plaintiffs' Motion for failure to confer and as untimely. Plaintiffs learned about the relocation of *NightGarden* installations at the latest in May 2020. Their failure to address any perceived spoliation then is fatal. To the extent the Court finds that the Motion is timely, Defendants had no duty to preserve the *NightGarden* experience because Plaintiffs' claims are unrelated to the physical layout of the lights. Even if there was a duty to preserve the event layout, Plaintiffs have not and cannot meet their burden to demonstrate the importance of the layout, any prejudice, bad faith, or potential for abuse. They cannot show any rational need to undertake further physical examination of the layout of *NightGarden*. The Motion should be denied, and Defendants should be awarded their fees.

Dated: May 28, 2021.

Respectfully Submitted,

SHULLMAN FUGATE PLLC

**Deanna K. Shullman**
Deanna K. Shullman (FBN 514462)
Allison S. Lovelady (FBN 70662)
Giselle M. Girones (FBN 124373)
James M. Slater (FBN 111779)
2101 Vista Parkway, Suite 4006
West Palm Beach, FL  33411
Tel: (561) 614-2592
dshullman@shullmanfugate.com
alovelady@shullmanfugate.com
ggirones@shullmanfugate.com
jslater@shullmanfugate.com

*Attorneys for Defendants*